IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:10-CV-476-D

NORTH CAROLINA WILDLIFE            )
FEDERATION, et. al.,               )
                                   )
                    Plaintiffs,    )
           v.                      )            **ORDER**
                                   )
NORTH CAROLINA DEPARTMENT          )
OF TRANSPORTATION, et. al.,        )
                                   )
                    Defendants.    )

On November 2, 2010, North Carolina Wildlife Federation, Clean Air Carolina, and Yadkin

Riverkeeper (collectively, "plaintiffs"), filed suit in the Eastern District of North Carolina. Compl.

[D.E. 1]. Plaintiffs sued the North Carolina Department of Transportation ("NCDOT"), Eugene

Conti, Secretary of NCDOT, Federal Highway Administration ("FHWA"), and John F. Sullivan,

FHWA Division Administrator (collectively, "defendants"), all of whom are responsible for planning

and authorizing the construction of the Monroe Connector/Bypass project ("Monroe Connector/

Bypass" or "project") in Union and Mecklenburg Counties, North Carolina. Compl. ¶¶ 19–22.

Plaintiffs allege that defendants have not carefully analyzed the environmental impacts

associated with the Monroe Connector/Bypass, and thereby violated the National Environmental

Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–70f. Specifically, plaintiffs allege that defendants

violated NEPA by: (1) failing to analyze the environmental impacts of the Monroe Connector/

Bypass; (2) conducting a flawed analysis of alternatives; and (3) presenting materially false and

misleading information to other agencies and to the public.

On November 23, 2010, plaintiffs filed a motion for a preliminary injunction against defendants [D.E. 8]. On December 16, 2010, the court held a lengthy hearing on plaintiffs' motion for a preliminary injunction. On December 30, 2010, the court denied plaintiffs' motion for a preliminary injunction [D.E. 28]. Approximately six months later, plaintiffs moved for summary judgment [D.E. 47] and filed a memorandum in support of that motion. Pls.' Mem. Supp. Mot. Summ. J. [D.E. 48]. On June 30, 2011, federal defendants, FHWA and John F. Sullivan, filed a cross-motion for summary judgment [D.E. 50]. State defendants, NCDOT and Eugene Conti, did the same [D.E. 52]. Both federal and state defendants filed memoranda in support of their cross-motions for summary judgment [D.E. 51, 53]. In July 2011, the parties exchanged several replies and surreplies [D.E. 55–58]. The parties also submitted several letters from the United States Fish and Wildlife Service ("USFWS") [D.E. 60–61, 63–64].

For the reasons set forth below, the court concludes that defendants' analysis concerning the Monroe Connector/Bypass complied with NEPA. Accordingly, the court grants defendants' motions for summary judgment and denies plaintiffs' motion for summary judgment.

I.

A.

NEPA is designed "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. To this end, NEPA sets forth a detailed regulatory scheme, the core of which is the Environmental Impact Statement ("EIS"). Nat'l Audubon Soc'y v. Dep't of the Navy, 422 F.3d 174, 184 (4th Cir. 2005). An EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The statement must contain a detailed examination of

the environmental impact of the proposed action, . . . any adverse

2

environmental effects which cannot be avoided should the proposal be implemented, . . . alternatives to the proposed action, . . . the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and . . . any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Id. §§ 4332(C)(i)–(v). In addition to these statutory requirements, Council on Environmental Quality ("CEQ") regulations require an EIS to discuss the environmental effects of the proposed action, 40 C.F.R. §§ 1502.15–1502.16, any reasonable alternatives to that action, id. §1502.14, any measures that may mitigate the negative environmental impact of the proposed action, id. §§ 1502.14(f), 1508.20, and the cumulative environmental impact of the proposed action and any other actions in the project area, id. §§ 1502.16, 1508.7.

NEPA's EIS requirement forces federal agencies to consider carefully the potential environmental consequences of their proposed actions, thereby ensuring "that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989); Nat'l Audubon Soc'y, 422 F.3d at 184. The EIS also facilitates public participation in the administrative process by providing greater information on agency decisions. Robertson, 490 U.S. at 349.

An EIS is drafted in two stages. The federal agency first prepares an initial statement called a Draft EIS. 40 C.F.R. § 1502.9(a). The agency then solicits comments on the Draft EIS from other agencies and the public. Id. § 1503.1(a). The agency must respond to relevant comments and then publish a Final EIS. Id. §§ 1502.9(b), 1503.4. Once the agency publishes the Final EIS, the agency may make its final decision on the proposed action. The agency must then publish that decision in a Record of Decision ("ROD"). Id. § 1505.2. Only then may the agency finalize its action. See id. § 1506.1(a).

3

B.

The facts in this case are not in dispute. See Pls.' Mem. Supp. Mot. Summ. J. 18; Fed. Defs.'

Mem. Supp. Mot. Summ. J. [D.E. 51] 11; State Defs.' Mem. Supp. Mot. Summ. J. [D.E. 53] 19–21.

Defendants propose to construct a new tollroad in Union and Mecklenburg Counties, on the eastern

side of Charlotte, North Carolina. (AR 029618). The Monroe Connector/Bypass, as it is called, will

extend approximately twenty miles from U.S. 74 near I-485 in Mecklenburg County to U.S. 74

between Wingate and Marshville, North Carolina, in Union County. (AR 029618). The project will

cost approximately $800 million. (AR 029228).

The Monroe Connector/Bypass began as two separate projects. (AR 029619). In early 2005,

the North Carolina Turnpike Authority ("NCTA") merged these projects at the request of the

Mecklenburg-Union Metropolitan Planning Organization ("MUMPO"), a local planning agency.

(AR 029620). NCTA began the NEPA process for the combined project in 2007. Pls.' Mem. Supp.

Mot. Summ. J. 6. Shortly thereafter, NCTA was absorbed into NCDOT, and NCDOT assumed

responsibility for the day-to-day direction of the NEPA process. Id.; see also N.C. Gen. Stat. Ann.

§ 136-89.182(b). FHWA supervised the NEPA process. Pls.' Mem. Supp. Mot. Summ. J. 6.

The NEPA process began with a Statement of Purpose and Need. Average travel speeds on

U.S. 74 currently are about twenty to thirty miles per hour ("mph") during peak travel times. By

2030, these speeds are expected to drop below twenty mph. Furthermore, traffic congestion is high:

one-third of the intersections in the project area operate at an unacceptable level of service during

peak hours, and by 2030, this level is expected to increase to two-thirds. (AR 026228). The

Statement of Purpose and Need declares that the project is necessary to relieve current and future

"[c]apacity [d]eficiencies" on existing U.S. 74 and to address that road's present and long-term

"[i]nability to serve high-speed regional travel . . . ." (AR 007503). Relatedly, the purpose of the

4

project is two-fold: (1) to "[c]onstruct a facility that allows for safe, reliable, high-speed regional travel in the US 74 Corridor between I-485 in Mecklenburg County and the Town of Marshville in Union County" that is "consistent with the North Carolina Strategic Highway Corridors Vision Plan for US 74 and the designation of US 74 on the North Carolina Intrastate System"; and (2) to "[i]mprove mobility in the US 74 corridor within the project study area, while maintaining access to properties along existing US 74." (AR 007504).

After formulating the Statement of Purpose and Need, defendants began analyzing various alternatives for the proposed project to determine which would best accommodate the stated purpose and need. Defendants considered nine different alternatives: (1) a "No-Build or No-Action Alternative;" (2) a "Transportation Demand Management Alternative;" (3) a "Transportation System Management Alternative;" (4) a "Mass Transit/Multi-Modal Alternative;" (5) an Improve Existing U.S. 74 Alternative (Standard Arterial Widening); (6) an Improve Existing U.S. 74 Alternative (Superstreet); (7) an Improve Existing U.S. 74 Alternative (Controlled-Access Highway); (8) a "New Location Alternative;" and (9) a "New Location/Improve Existing Roadways Hybrid Alternative." (AR 014068–014076). Defendants analyzed these alternatives over the course of three different stages of screening. Defendants first analyzed the alternatives in a qualitative screening, during which any alternatives that were deemed infeasible or unable to fulfill the stated purpose and need were eliminated. Each eliminated alternative was briefly described and analyzed in the defendants' Draft Environmental Impact Statement ("Draft EIS"), and the reasons for eliminating the alternative were presented. (AR 014068–014077). Furthermore, each alternative carried forward for further examination was discussed, along with the reasons for retaining each of those alternatives. (AR 014068–014077). The alternatives that survived the qualitative first screening then underwent a qualitative second screening. Defendants eliminated some of those alternatives

5

at this stage and kept others. The Draft EIS presented the reasoning behind these decisions. (AR 014077–014085). Finally, defendants analyzed the remaining alternatives under a quantitative third screening. Once more, defendants eliminated some alternatives and retained others, and justified these decisions in the Draft EIS. (AR 014085–014098). The Draft EIS also presented the design, methodology, and criteria for all three screening phases. (AR 014068–014098). Defendants incorporated this section of the Draft EIS by reference into the Final Environmental Impact Statement ("Final EIS"). (AR 026232–026240). They also summarized all of this information in the Final EIS. (AR 026232– 026640).

When analyzing the various alternatives during these three screening phases, defendants relied on forecasts of traffic volumes that would result from each. These forecasts were developed using MUMPO's Regional Travel Demand Model. The Regional Travel Demand Model, in turn, contained socioeconomic data that were compiled using MUMPO's household, population, and employment projections. In addition to using these projections, MUMPO relied on local planners from each jurisdiction in the project area to develop the dataset. Although these data were used to forecast traffic volumes for each alternative considered—including those alternatives that did not involve construction of a new tollroad—the projections and information used to build the dataset contemplated construction of the Monroe Connector/Bypass. (AR 022199, 022931); see also Fed. Defs.' Mem. Supp. Mot. Summ. J. 18; State Defs.' Mem. Supp. Mot. Summ. J. 8–12.

After the quantitative third screening, seventeen total detailed study alternatives ("DSA") remained. (AR 014098–014099). Sixteen of these DSAs were "New Location Alternatives" ("Build alternative" or "Build scenario"), one of which became the preferred Build alternative. The seventeenth was the "No-Build or No-Action Alternative" ("No-Build alternative" or "No-Build scenario"). (AR 014098–014099). These seventeen DSAs were presented in the Draft EIS, (AR

6

014098–014099), and in the Final EIS, (AR 026236–026240).

All sixteen Build alternatives fell into the same future land-use study area ("FLUSA"). See (AR 026271–026272). In fact, although slight variations exist among them, all of them follow essentially the same path and cover virtually the same land. (AR 026272–026274).

Once defendants had narrowed the viable alternatives to these seventeen scenarios, they conducted three analyses of the indirect and cumulative environmental effects of each. The first was a qualitative indirect and cumulative effects study conducted in 2009 ("2009 Qualitative ICE"). (AR 026883–026969). This study evaluated the indirect and cumulative environmental impacts of all seventeen DSAs. (AR 026883–026969). As a result of the 2009 Qualitative ICE, defendants concluded that the indirect and cumulative environmental impact of the sixteen Build scenarios would be the same. State Defs.' Mem. Supp. Mot. Summ. J. 37.

After defendants completed the 2009 Qualitative ICE, USFWS and several other agencies requested that defendants conduct a quantitative indirect and cumulative effects ("ICE") analysis and a water quality ICE analysis. State Defs.' Mem. Supp. Mot. Summ. J. 37. Defendants complied, conducting an ICE Quantitative Analysis ("2010 Quantitative ICE"), (AR 027050–027141), and an ICE Water Quality Analysis ("Water Quality ICE"), (AR 027237–027288). The 2010 Quantitative ICE compared only the preferred Build and the No-Build scenarios. The Final EIS included these ICE analyses in full in Appendices G, H, and I. (AR 026879–027310). Like the three screening phases of the alternatives analysis, defendants' ICE analyses relied on the socioeconomic data that contemplated construction of the Monroe Connector/Bypass. State Defs.' Mem. Supp. Mot. Summ. J. 13; see also (AR 027086–027087).

Defendants took several steps to ensure the propriety of using the data. Even before using the data in the 2009 Qualitative ICE, defendants asked Michael Baker Engineering ("Baker

7

Engineering"), one of defendants' consultants, to interview local planners and MUMPO staff to ensure that the data were appropriate for both the Build and No-Build scenarios. See (AR 026971–027029). Baker Engineering was asked to make the same inquiry before the data were used in the 2010 Quantitative ICE. State Defs.' Mem. Supp. Mot. Summ. J. 16; see also (AR 027144–027179). Both times, Baker Engineering confirmed that the data were appropriate.

Nevertheless, when the Final EIS was published for comment on May 25, 2010, USFWS and plaintiffs challenged the propriety of using the socioeconomic data to project both the Build and No-Build scenarios. (AR 028433, 029660). In response, defendants took several additional steps to confirm that using the data was proper.

First, in June, 2010, defendants asked Baker Engineering to investigate whether using the data to project the No-Build scenario was proper. Baker Engineering examined the data and concluded that they accurately reflected the No-Build scenario and therefore could be used to project the traffic volumes and growth-inducing impact of that alternative. (AR 029556–029557). Baker Engineering's methodology and reasoning were explained in a June 28, 2010 memorandum that was sent to USFWS. (AR 028460, 029556–029557).

That same month defendants asked Baker Engineering to re-interview local planners and MUMPO staff who had been involved in creating the data that were used to project both the Build and No-Build scenarios. See (AR 028647–028682). In early July, 2010, Baker Engineering emailed twelve individuals, asking each to confirm "our assumption that these forecasts represent a future scenario without the Monroe Connector." E.g., (AR 028652, 028655, 028657, 028660, 028663, 028666, 028670, 028674). If an interviewee could not confirm the assumption, Baker Engineering requested that the interviewee provide additional information "that would indicate that the Monroe Connector was a consideration in developing the . . . socioeconomic growth forecasts." E.g., (AR

8

028652, 028655, 028657–028658, 028660, 028663, 028666, 028670, 028674). Finally, Baker Engineering solicited "[a]ny information or recollections . . . that would shed light on this question . . . ." E.g., (AR 028652, 028655, 028658, 028660, 028663, 028666, 028670, 028674). Of the twelve interviewees, eight confirmed the accuracy of the projections of the No-Build scenario that were based on the socioeconomic data. The other four interviewees were unable to confirm or refute the assumption. No interviewee refuted that using the socioeconomic data was proper. (AR 028647–028648).

With these confirmations, defendants responded to USFWS's and plaintiffs' comments on June 28, 2010, and August 22, 2010, respectively. In so doing, defendants mistakenly stated that the data did not contemplate construction of the Monroe Connector/Bypass. (AR 029557, 029660). Such statements contradicted what defendants already knew, (AR 022199, 022931), and defendants have since retracted them. See Fed. Defs.' Mem. Supp. Mot. Summ. J. 33–34; State Defs.' Mem. Supp. Mot. Summ. J. 12, 49–50. Regardless, defendants confirmed that using the socioeconomic data to project traffic volumes and to forecast the growth-inducing impact of the Build and No-Build scenarios was proper, and relayed this information to both USFWS and plaintiffs. (AR 029556–029557, 029660).

During the process, defendants also discovered that their initial traffic forecast for the 2035 No-Build scenario was overstated. Defendants corrected this forecast and included the new projection in Appendix A of the Final EIS, entitled "Draft Environmental Impact Statement Errata." (AR 026425–026427).

On August 22, 2010, defendants published an ROD, announcing that the Monroe Connector/Bypass would be constructed. (AR 029614–029714). But the ROD did not end the inquiries into the propriety of defendants' use of the socioeconomic data. After plaintiffs filed suit,

9

USFWS received "unsolicited information (electronic copies of briefs) from the Southern Environmental Law Center, counsel for the plaintiffs . . . ." Reply to Pls.' Aug. 29, 2011, Resp. [D.E. 63] Ex. A, at 1. After reviewing the briefs, USFWS "became concerned that the information seemed to imply that the 'build' scenario had a greater influence on the 'no-build' baseline than we had assumed in our evaluation" and requested that defendants provide further assurances that using the socioeconomic data was proper. Id. Defendants then provided USFWS "relevant portions of the administrative record along with an explanation of the Regional Travel Demand Model that clarified how and in which portions of the project area the [data] included the 'build' scenario." Id. This supplemental information "satisfied" USFWS "that the proposed project will not involve impacts beyond those initially presented . . . ." Id. On August 29, 2011, USFWS reaffirmed its original concurrence with defendants' "'not likely to adversely affect' determination . . . ." Id.

II.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); see Fed. R. Civ. P. 56(a), (c). This same standard applies to cross-motions for summary judgment. See Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011). Each party's motion is analyzed individually under the Rule 56 standard to determine whether summary judgment should be granted. Id.; Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co., 176 F.3d 794, 797 (4th Cir. 1999).

Here, there is no genuine issue of material fact. See Pls.' Mem. Supp. Mot. Summ. J. 18; Fed. Defs.' Mem. Supp. Mot. Summ. J. 11; State Defs.' Mem. Supp. Mot. Summ. J. 19–21; see also

10

Am. Arms Int'l v. Herbert, 563 F.3d 78, 86 n.12 (4th Cir. 2009) ("[A]n administrative record is a duly authenticated record that enjoys a presumption of verity. . . . [T]hat record, unless somehow contradicted, satisfie[s] the [agency's] initial burden of demonstrating the absence of any genuine issue of [material] fact." (quotations omitted)). Thus, the court considers the parties' cross-motions for summary judgment.

To analyze the parties' cross-motions for summary judgment, the court first considers the applicable standard of review. NEPA itself does not provide a private right of action. See, e.g., N.C. Alliance for Transp. Reform, Inc. v. U.S. Dep't of Transp., 151 F. Supp. 2d 661, 678 (M.D.N.C. 2001). Instead, the Administrative Procedure Act ("APA") provides a right to judicial review of final agency action, including final agency action under NEPA. Id.; 5 U.S.C. §§ 702, 706(2)(A); see Jersey Heights Neighborhood Ass'n v. Glendening, 174 F.3d 180, 186 (4th Cir. 1999). Under the APA "[a] person . . . adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702. A reviewing court must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. § 706(2)(A). An agency violates this standard if, in making its decision, it

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). This standard of review is narrow. See, e.g., Marsh v. Or. Natural Res. Council, 490 U.S. 360, 377–78 (1989); Hughes River Watershed Conservancy v. Johnson (Hughes River II), 165 F.3d 283, 287 (4th Cir. 1999). A court may look to see only whether the agency has made a "clear error of judgment." Hughes River II, 165 F.3d at 287 (citation omitted); see also Fort Sumter Tours, Inc. v. Babbitt, 66 F.3d 1324, 1335 (4th Cir. 1995).

11

Under the APA, plaintiff has the burden of proof. Sierra Club v. Marita, 46 F.3d 606, 619 (7th Cir. 1995); N.C. Alliance for Transp. Reform, 151 F. Supp. 2d at 679. Thus, plaintiffs must demonstrate that defendants' action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

NEPA requires an agency to take a "hard look" at the potential environmental impact of the proposed action. Robertson, 490 U.S. at 350; Nat'l Audubon Soc'y, 422 F.3d at 185; Hughes River Watershed Conservancy v. Glickman (Hughes River I), 81 F.3d 437, 443 (4th Cir. 1996). Although this inquiry must be "searching and careful," City of Alexandria, Va. v. Fed. Highway Admin., 756 F.2d 1014, 1017 (4th Cir. 1985) (quotation omitted), a court may not substitute its own substantive judgment for that of the agency. Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976). NEPA does not mandate any particular eco-friendly, substantive outcome. Rather, the statute's requirements are purely procedural. Robertson, 490 U.S. at 350; Nat'l Audubon Soc'y, 422 F.3d at 184. "NEPA merely prohibits uninformed—rather than unwise—agency action." Robertson, 490 U.S. at 351. Accordingly, judicial review focuses on "whether the agency, in its conclusions, made a good faith judgment, after considering all relevant factors, including possible alternative or mitigative measures." Coal. for Responsible Reg'l Dev. v. Coleman, 555 F.2d 398, 400 (4th Cir. 1977). Moreover, when reviewing the sufficiency of an EIS under NEPA, a court may not "'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor." Nat'l Audubon Soc'y, 422 F.3d at 186 (citations omitted). The court must instead follow a holistic approach. Id.

### III.

Here, plaintiffs raise three challenges to the Final EIS. First, plaintiffs claim that defendants failed to analyze the environmental impacts of the proposed Monroe Connector/Bypass. Pls.' Mem. Supp. Mot. Summ. J. 22. Second, plaintiffs contend that defendants failed to properly examine the

12

reasonable alternatives to the project. Id. 32. Third, plaintiffs argue that defendants presented false and misleading information in the Final EIS and other documents, thereby breaching defendants' duty to inform other agencies and the public. Id. 44. The court examines each argument seriatim.

A.

NEPA requires that an agency analyze all environmental impacts of a proposed agency action. See 40 C.F.R. § 1502.16. This analysis must include both direct and indirect effects. Id. "Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." Id. § 1508.8(b). Only indirect effects are at issue here. See Pls.' Mem. Supp. Mot. Summ. J. 22–23.

Plaintiffs advance four reasons why the Final EIS failed to properly analyze the indirect environmental impact of the Monroe Connector/Bypass: (1) defendants used faulty socioeconomic data, causing them to improperly account for the growth-inducing impact of the project; (2) the Final EIS assumes that the project area will continue to urbanize with or without the Monroe Connector/Bypass; (3) the Final EIS did not explain defendants' methodology and did not use accurate model inputs; and (4) the Final EIS failed to study the indirect environmental impacts of multiple alternatives. Id. 22–23.

1.

Judicial review of an agency's NEPA compliance does not include flyspecking the agency's decision-making process. Nat'l Audubon Soc'y, 422 F.3d at 186 (quotations omitted). "[C]ourts undertake their review with a recognition that Congress did not mandate perfection." Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin., 772 F.2d 700, 708 (11th Cir. 1985). This principle particularly applies concerning judicial review of the data and methodology that an agency uses in

13

formulating a decision. After all, agencies, not courts, have the technical and scientific expertise required for proper environmental analysis. See Marsh, 490 U.S. at 377; Highway J Citizens Grp., U.A. v. U.S. Dep't of Transp., 656 F. Supp. 2d 868, 885 (E.D. Wis. 2009). The data and methodology simply must be reasonable. See Marsh, 490 U.S. at 378 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts. . . ."); Hughes River II, 165 F.3d at 289 ("Agencies are entitled to select their own methodology as long as that methodology is reasonable."); Druid Hills, 772 F.2d at 711 ("[T]he district court simply determined whether the appellees' choice of methodology had a rational basis, consistently applied, taking relevant considerations into account . . . . [T]his finding is not clearly erroneous."); Rankin v. Coleman, 394 F. Supp. 647, 654 (E.D.N.C. 1975) ("The 'adequacy' of an environmental impact statement necessarily must be measured by a 'reasonableness' standard.").

Here, plaintiffs contend that defendants failed to properly analyze the growth-inducing impact of the Monroe Connector/Bypass because defendants analyzed the impact of the Build and No-Build scenarios using socioeconomic data that already contemplated building the project. See Pls.' Mem. Supp. Mot. Summ. J. 23. Defendants have admitted that the socioeconomic data did, in fact, contemplate building the Monroe Connector/Bypass, and that they used the same data to analyze the growth-inducing impact of both the Build and No-Build scenarios. See Fed. Defs.' Mem. Supp. Mot. Summ. J. 11 n.4, 16–17; State Defs.' Mem. Supp. Mot. Summ. J. 12–13. Nonetheless, defendants argue that using the socioeconomic data was reasonable and that the outcome of their analysis of the growth-inducing impacts is valid. See Fed. Defs.' Mem. Supp. Mot. Summ. J. 17–24; State Defs.' Mem. Supp. Mot. Summ. J. 27–29. The court agrees with defendants.

Defendants took extensive steps to ensure that the socioeconomic data constituted an appropriate baseline for constructing the No-Build scenario. As discussed, before using the data in

14

the 2009 Qualitative ICE, defendants asked Baker Engineering to interview local planners and MUMPO staff to ensure that the data were appropriate for both the Build and No-Build scenarios. See (AR 026971–027029). Baker Engineering was asked to make the same inquiry before the data were used in the 2010 Quantitative ICE. State Defs.' Mem. Supp. Mot. Summ. J. 16; see also (AR 027144–027179). Both times, Baker Engineering confirmed that the data were appropriate. See State Defs.' Mem. Supp. Mot. Summ. J. 16.

After the 2010 Quantitative ICE was completed, USFWS asked defendants to reaffirm the propriety of using the socioeconomic data to project the No-Build scenario. (AR 028433). Defendants obliged and, in June 2010, asked Baker Engineering to investigate once more the validity of the data. Baker Engineering reexamine the data and reconfirmed that it accurately represented the No-Build scenario. (AR 029556–029557). Baker Engineering documented this conclusion in a June 28, 2010 memorandum that also included the methodology and reasoning behind its analysis. (AR 029556–029557). Defendants could have stopped at this point, having thrice confirmed that using the socioeconomic data to project both the Build and No-Build scenarios was reasonable.

Defendants did not stop. They asked Baker Engineering to re-interview local planners and MUMPO staff to affirm once more that using the data was appropriate. (AR 028647–028682). Pursuant to this request, in early July 2010, Baker Engineering emailed twelve individuals, asking each to confirm "our assumption that these forecasts represent a future scenario without the Monroe Connector." E.g., (AR 028652, 028655, 028657, 028660, 028663, 028666, 028670, 028674). If an interviewee could not confirm the assumption, Baker Engineering requested that the interviewee provide additional information "that would indicate that the Monroe Connector was a consideration in developing the . . . socioeconomic growth forecasts." E.g., (AR 028652, 028655, 028657–028658, 028660, 028663, 028666, 028670, 028674). Finally, Baker Engineering solicited "[a]ny

15

information or recollections . . . that would shed light on this question . . . ." E.g., (AR 028652, 028655, 028658, 028660, 028663, 028666, 028670, 028674). Of the twelve interviewees, eight confirmed that the projections of the No-Build scenario that were based on the socioeconomic data were accurate. The other four interviewees were unable to confirm or refute the assumption. No interviewee refuted the propriety of using the socioeconomic data. (AR 028647–028648). On July 26, 2010, Baker Engineering concluded "that the . . . socioeconomic forecast is a reasonable basis for the No Build Scenario . . . ." (AR 028649).

This evidence demonstrates the thorough effort defendants made to ensure that their data and analyses were proper. Baker Engineering's additional investigations confirmed the propriety of the socioeconomic data and the accuracy of the analyses. Accordingly, the court concludes that defendants' use of and reliance on these data was reasonable and did not violate defendants' NEPA obligations.

In opposition to this conclusion, plaintiffs cite several cases. The cases, however, are distinguishable. For example, in Highway J Citizens Group, defendants analyzed the growth-inducing impact of their project by first using regional and local land-use plans to identify the growth that had been anticipated before the agency decided to expand a thoroughfare in the area. 656 F. Supp. 2d at 886. Defendants then asked several local governments to complete a survey providing input on land use and development. Id. In the EIS, defendants merely summarized these inputs and concluded that the project would not induce growth. Id. The court rejected defendants' analysis concerning the growth-inducing impacts because "it is not a discussion but simply a summary of land use plans and survey responses followed by a bare conclusion." Id. Defendants never explained how they interpreted the land-use plans and survey results. Nor did defendants explain how they reached their ultimate conclusion. Id. Furthermore, the Administrative Record failed to show that

16

defendants ever conducted a more thorough analysis. See id. at 887. An "EIS cannot simply assume that development will occur at the same pace whether or not" new highways are constructed. Id.

Here, in contrast, the Final EIS thoroughly discussed defendants' analysis of the project's growth-inducing impact. The 2009 Qualitative ICE contains a detailed discussion of the study design and methodology (AR 026887–026893), as well as a discussion of current population-growth and employment trends, and existing land-use patterns (AR 026895–026918). From there, the study examines the effects that the Monroe Connector/Bypass is likely to have on those trends and patterns by identifying the drivers of those trends and patterns and discussing whether those drivers will remain with or without construction of the project. (AR 026931–026950). Defendants also meticulously explained the growth-inducing impact they expect the project to have and why they hold those expectations. The 2010 Quantitative ICE is similarly detailed, explaining the methodology defendants used to develop the study and to analyze the growth-inducing impact of the Monroe Connector/Bypass. It also discusses the limits of defendants' analysis. (AR 027083–028087, 027095–027098).

Defendants have gone far beyond a simple summary and base conclusion. The breadth and depth of defendants' analyses distinguish this case from Highway J Citizens Group. As such, Highway J Citizens Group does not help plaintiffs.

Likewise, City of Davis v. Coleman, 521 F.2d 661 (9th Cir. 1975), does not help plaintiffs. In Coleman, plaintiff challenged the proposed construction of an interchange and a network of frontage roads to replace a temporary access road. Id. at 666–67. The purpose of the project was "to stimulate and service future industrial development" in the project area. Id. at 667. Yet, the EIS never discussed the potential growth-inducing impact—or any other indirect effects—of the proposed interchange. Id. at 680–81. Accordingly, the Ninth Circuit held that the defendants

17

violated NEPA. Id. at 682.

In contrast to Coleman, defendants analyzed the project's growth-inducing effects. Indeed, defendants examined those effects in great detail and explained their analyses and conclusions in the Final EIS. (AR 026937–026950, 027095–027098).

Finally, Sierra Club v. U.S. Dep't of Transp., 962 F. Supp. 1037 (N.D. Ill. 1997), does not help plaintiffs. In Sierra Club, the court examined the record and held that the socioeconomic data that contemplated construction of the project could not reasonably be used to compare the growth-inducing effects of the Build and No-Build scenarios. See Sierra Club, 962 F. Supp. at 1043–44.

In contrast to Sierra Club, the record in this case includes defendants' reasoned conclusions concerning alternatives and growth-inducing effects. Cf. Nat'l Audubon Soc'y, 422 F.3d at 186 ("[A]n agency's obligations under NEPA are case-specific. A 'hard look' is necessarily contextual."); Rankin, 394 F. Supp. at 654 ("[W]hat may be 'reasonable' in one case may not necessarily be 'reasonable' in another."). Defendants acted reasonably, and nothing more is required. See, e.g., Marsh, 490 U.S. at 378; Hughes River II, 165 F.3d at 289. Thus, the court rejects plaintiffs' argument.

2.

Second, plaintiffs argue that defendants' Final EIS "simply assumes that the [project] area will continue to urbanize whether or not new highways are built." Pls.' Mem. Supp. Mot. Summ. J. 28 (quotations omitted). However, defendants' 2009 Qualitative ICE and 2010 Quantitative ICE—which are in Appendices G and H of the Final EIS—contain a lengthy discussion of current growth trends and their driving forces. (AR 026888–026893, 026903–026925, 027053–027055, 027070–027072). Furthermore, the 2010 Quantitative ICE discusses defendants' study of the growth-inducing impacts of the Build and No-Build scenarios. E.g., (AR 027053–027059,

18

027096–027101). Rather than assume, without more, that growth and urbanization would continue apace with or without the Monroe Connector/Bypass, defendants conducted a study that proved such growth. Thus, the court rejects plaintiffs' argument.

3.

Third, plaintiffs argue that defendants did not explain the methodology behind their ICE analyses. Pls.' Mem. Supp. Mot. Summ. J. 30. NEPA requires an EIS to "identify any methodologies used and . . . make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement." 40 C.F.R. § 1502.24. NEPA does not, however, mandate that the methodologies be discussed in the body of the EIS. NEPA's methodology-disclosure requirement is satisfied if the discussion is presented in an appendix. Id.

Here, defendants' 2009 Qualitative ICE, 2010 Quantitative ICE, and Water Quality ICE contain detailed discussions of defendants' methodology and list all references used. (AR 026879–027309). Those ICE analyses are located in Appendices G, H, and I of the Final EIS. (AR 026881, 027048, 027235). Furthermore, the 2009 Qualitative ICE followed NCDOT guidelines, which were incorporated by reference into the Final EIS. (AR 026894). Accordingly, defendants properly explained the methodology underlying their ICE analyses, and the court rejects plaintiffs' argument.

4.

In plaintiffs' final challenge to defendants' analysis of the indirect environmental impacts of the Monroe Connector/Bypass, plaintiffs contend that defendants failed to examine the indirect effects of multiple alternatives to the proposed project. Specifically, plaintiffs argue that the 2010 Quantitative ICE analyzed only construction of the project versus no construction of the project, and thereby violated NEPA. Pls.' Mem. Supp. Mot. Summ. J. 31.

19

When defendants conducted their 2010 Quantitative ICE, they already had narrowed the possible alternatives to sixteen Build scenarios and one No-Build scenario. (AR 014098–014099). The 2010 Quantitative ICE, however, examined the effects of only one Build and the No-Build scenario. See generally (AR 027050–027141). However, all sixteen Build alternatives were located in the same FLUSA. (AR 026887, 026897). In fact, each alternative covered almost the exact same path, with only slight variations here and there. (AR 026272–026274). All sixteen alternatives "begin near I-485 in Mecklenburg County, run northwest of and parallel to the existing US 74 corridor, and end at US 74 between the towns of Wingate and Marshville in Union County." (AR 026897). Because these alternatives were so similar in location, all were expected to have the same environmental impact. The 2009 Qualitative ICE confirmed this assumption. Thus, when defendants' 2010 Quantitative ICE compared the No-Build scenario with one Build scenario, it essentially compared the No-Build alternative with all sixteen Build alternatives. Defendants acted reasonably in comparing the No-Build alternative with only one Build alternative. Accordingly, the court rejects plaintiffs' argument.

In sum, defendants' analysis of the indirect environmental impact of the Monroe Connector/Bypass was reasonable and did not violate NEPA. Defendants' actions were not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

B.

NEPA requires that an EIS contain a detailed statement describing reasonable alternatives to a proposed action. Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 551 (1978); S.C. Dep't of Wildlife and Marine Res. v. Marsh, 866 F.2d 97, 99 (4th Cir. 1989); see also 42 U.S.C. § 4332(C). CEQ regulations further specify that an agency must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were

20

eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). A thorough alternatives analysis is "the heart of the environmental impact statement." Id. § 1502.14.

Here, plaintiffs argue that defendants failed to meet this alternatives-analysis requirement, and make two specific challenges. First, plaintiffs argue that defendants formulated the project's Statement of Purpose and Need too narrowly, leading in part to defendants' failure to consider a reasonable range of alternatives. Second, defendants lacked a reasonable basis for comparing the alternatives they did analyze because defendants relied on faulty socioeconomic data. See Pls.' Mem. Supp. Mot. Summ. J. 32.

1.

A proper alternatives analysis under NEPA involves two broad steps. First, an agency must identify the purpose and need of its proposed action. 40 C.F.R. § 1502.13. Such identification in turn informs the range of alternatives to consider. See id. Second, an agency must thoroughly analyze these alternatives. Id. § 1502.14(a).

Plaintiffs contend that defendants formulated an overly narrow Statement of Purpose and Need. Specifically, plaintiffs argue that "[d]efendants' statement restricted the consideration of any alternatives to a new location toll highway and reached a pre-ordained result." Pls.' Mem. Supp. Mot. Summ. J. 37.

The project's Statement of Purpose and Need belies plaintiffs' argument. The stated need for the project is to relieve capacity deficiencies and to address U.S. 74's present inability to accommodate high-speed regional travel. (AR 007503). As mentioned, average travel speeds on the current U.S. 74 are about twenty to thirty mph during peak travel times. By 2030, these speeds are expected to drop below twenty mph. Furthermore, traffic congestion is high: one-third of the

21

intersections in the project area operate at an unacceptable level of service during peak hours, and by 2030, this level is expected to increase to two-thirds. (AR 026228). Moreover, the purpose of the project is two-fold: (1) to "[c]onstruct a facility that allows for safe, reliable, high-speed regional travel in the US 74 Corridor between I-485 in Mecklenburg County and the Town of Marshville in Union County" that is "consistent with the North Carolina Strategic Highway Corridors Vision Plan for US 74 and the designation of US 74 on the North Carolina Intrastate System;" and (2) to "[i]mprove mobility in the US 74 corridor within the project study area, while maintaining access to properties along existing US 74." (AR 007504).

Although, plaintiffs argue that the Statement of Purpose and Need does not look at underlying transportation needs in the study area, the court is hard-pressed to understand how "improv[ing] mobility and capacity within the project study area by providing a facility . . . that allows for high-speed regional travel" does not do just that. (AR 014037). In addition, the Statement of Purpose and Need does state that the project must be "consistent with the North Carolina Strategic Highway Corridors Vision Plan for US 74 and the designation of US 74 on the North Carolina Intrastate System." (AR 007504). Nothing in this requirement, however, necessarily restricts viable projects to construction of a new highway (as opposed to alternatives such as lightrail or arterial widening). Nor have plaintiffs—who carry the burden of proof—proffered any facts suggesting otherwise. Even if they had, agencies are permitted to consider and incorporate transportation planning when developing a statement of purpose and need. See 23 C.F.R. 450 app. A.

Plaintiffs would have preferred a differently worded Statement of Purpose and Need. In fact, they offer an alternative in their brief. Pls.' Mem. Supp. Mot. Summ. J. 38. However, "[t]he statement of a project's purpose and need is left to the agency's expertise and discretion, and [courts]

22

defer to the agency if the statement is reasonable." Alliance for Legal Action v. Fed. Aviation Admin., 69 F. App'x 617, 622 (4th Cir. 2003) (per curiam) (unpublished). Here, defendants' Statement of Purpose and Need is reasonable, and plaintiffs have failed to prove otherwise.

In addition to developing a reasonable Statement of Purpose and Need, defendants considered a reasonable range of alternatives. Although NEPA requires that an EIS explore all reasonable alternatives, 40 C.F.R. § 1502.14(a), "there is no minimum number of alternatives that must be discussed." Laguna Greenbelt, Inc. v. U.S. Dep't of Transp., 42 F.3d 517, 524 (9th Cir. 1994) (per curiam). Understandably, "the concept of alternatives must be bounded by some notion of feasibility." Vt. Yankee, 435 U.S. at 551; see Tongass Conservation Soc'y v. Cheney, 924 F.2d 1137, 1139–42 (D.C. Cir. 1991) (upholding an EIS in which only one of fourteen alternatives was thoroughly examined, the other thirteen being dismissed as infeasible). An agency need consider only those alternatives that are feasible and that reasonably satisfy the statement of purpose and need. Laguna Greenbelt, 42 F.3d at 524; 40 C.F.R. § 1502.14(a).

Here, defendants considered nine different alternatives: (1) a "No-Build or No-Action Alternative;" (2) a "Transportation Demand Management Alternative;" (3) a "Transportation System Management Alternative;" (4) a "Mass Transit/Multi-Modal Alternative;" (5) an Improve Existing U.S. 74 Alternative (Standard Arterial Widening); (6) an Improve Existing U.S. 74 Alternative (Superstreet); (7) an Improve Existing U.S. 74 Alternative (Controlled-Access Highway); (8) a "New Location Alternative;" and (9) a "New Location/Improve Existing Roadways Hybrid Alternative." (AR 014068–014076). The process by which these alternatives were examined is chronicled in great detail in the Draft EIS. (AR 014068–014098). In brief, the process was as follows.

Defendants began by examining each alternative in a qualitative first screening. (AR 014068–014077). Defendants briefly discussed those that were eliminated as infeasible or as not

fulfilling the Statement of Purpose and Need along with the reasons for their elimination. (AR 014068–014077). The alternatives that passed the first qualitative screening were subjected to a second. (AR 014077–014085). Again, some alternatives were eliminated at this stage. Those alternatives and the reasons for their elimination were briefly described in the Draft EIS. (AR 014077–014085). The remaining alternatives were subjected to a quantitative third screening. (AR 014085–014098). Some more alternatives were eliminated at this point. Again, defendants briefly discussed the alternatives and the reasons for eliminating them in the Draft EIS. (AR 014085–014098).

After these three screenings, the remaining alternatives were designated as DSAs and were carried forward for more extensive examination. (AR 014098–014085). These DSAs consisted of sixteen Build alternatives and one No-Build alternative. Defendants studied each extensively, first in the Draft EIS, (AR 014098–014111), and then in the 2009 Qualitative ICE, the 2010 Quantitative ICE, and the Water Quality ICE, (AR 026879–027310).

Defendants' alternatives analysis complies with NEPA and with governing regulations. Although plaintiffs would like for defendants to have considered more alternatives, "[a]n EIS need not consider every conceivable alternative . . . ." Laguna Greenbelt, 42 F.3d at 525 (citing Vt. Yankee, 435 U.S. at 551). Thus, the court rejects plaintiffs' argument.

2.

Next, plaintiffs argue that defendants could not have reasonably compared alternatives because defendants relied on a single set of socioeconomic data to predict the traffic forecasts that were the basis of the comparison. Pls.' Mem. Supp. Mot. Summ. J. 39. The court has already explained why defendants' reliance on the socioeconomic data was reasonable, and will not repeat that discussion.

24

Alternatively, even if this court had not reached that conclusion, plaintiffs' argument concerning traffic forecasts still fails. When the need for a proposed project is based on existing, as well as future, traffic congestion, and when the population of the project area will likely continue to grow even absent construction of the project, immaterial flaws in projecting future traffic volumes will not invalidate an EIS. See, e.g., Laguna Greenbelt, 42 F.3d at 526–27; Piedmont Heights Civic Club, Inc. v. Moreland, 637 F.2d 430, 442 (5th Cir. 1981); Nat'l Wildlife Fed'n v. Lewis, 519 F. Supp. 523, 533–34 (D. Conn. 1981), aff'd sub nom. Nat'l Wildlife Fed'n v. Goldschmidt, 677 F.2d 259 (2d Cir. 1982).

Here, one of the primary purposes of the Monroe Connector/Bypass is to "improve mobility and capacity," (AR 014037), by relieving both current and future congestion, (AR 014036–014063, 007503–007504). As mentioned, average travel speeds on the current U.S. 74 are about twenty to thirty mph during peak travel times. The problem will only worsen: by 2030, these speeds are expected to drop below twenty mph. In addition to slow speeds, traffic congestion is high, and one-third of the intersections in the project area operate at an unacceptable level of service during peak hours. By 2030, this level is expected to increase to two-thirds. (AR 026228). Furthermore, Union County—the area surrounding most of the project—is expected to continue growing, even if the Monroe Connector/Bypass is never constructed. "According to the North Carolina Office of State Budget and Management, population in Union County is expected to grow even more rapidly (64.6%) between 2000 and 2010, with growth rates decreasing from 2010 to 2020 (34.7%) and from 2020 to 2030 (28.0%)." (AR 026905). Indeed, "Union County is likely to continue to grow at a rate at least two times that of the State over the next couple of decades." (AR 026905). Simply put, plaintiffs' argument concerning traffic forecasts lacks merit, and the court rejects it.

25

Finally, plaintiffs contend that the data correction that defendants made to the 2035 No-Build traffic forecasts was obscured from public view. Pls.' Mem. Supp. Mot. Summ. J. 42. However, defendants placed the corrected data in an appendix to the Final EIS entitled "Draft Environmental Impact Statement Errata." (AR 026425–026431). Thus, defendants did not obscure the corrections from public view.

In sum, defendants' alternatives analysis was reasonable and did not violate NEPA. Defendants' actions were not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

C.

Last, plaintiffs assert that defendants failed to address USFWS's concerns about using the socioeconomic data in the ICE analyses, and that defendants presented materially false and misleading information to USFWS and to plaintiffs when defendants asserted that the socioeconomic data did not contemplate construction of the Monroe Connector/Bypass. See Pls.' Mem. Supp. Mot. Summ. J. 44–50.

When the Final EIS was published for comment on May 25, 2010, USFWS raised concerns over the propriety of projecting the No-Build scenario using socioeconomic data that contemplated construction of the Monroe Connector/Bypass. (AR 028433). Rather than ignore the USFWS's concerns, defendants responded by taking several steps to affirm that using the data was proper. As discussed, in June, 2010, defendants asked Baker Engineering to investigate whether using the data to project the No-Build scenario was proper. Baker Engineering examined the data and concluded that it accurately reflected the No-Build scenario and therefore could be used to project the traffic volumes and growth-inducing impact of that alternative. (AR 029556–029557). Baker Engineering's methodology and reasoning were explained in a June 28, 2010 memorandum that

26

was sent to USFWS. (AR 028460, 029556–029557). That same month, defendants also asked Baker Engineering to re-interview local planners and MUMPO staff to affirm once more that using the data was appropriate. See (AR 028647–028682). Accordingly, in early July, 2010, Baker Engineering emailed twelve individuals, asking each to either confirm or refute, with supporting information, the validity of "our assumption that these forecasts represent a future scenario without the Monroe Connector." E.g., (AR 028652, 028655, 028657, 028660, 028663, 028666, 028670, 028674). Eight interviewees confirmed the assumption and none refuted it. (AR 028647–028648). Baker Engineering therefore concluded that the "socioeconomic forecast is a reasonable basis for the No Build Scenario . . . ." (AR 028649).

Simply put, the Administrative Record refutes plaintiffs' argument that defendants failed to address USFWS's concerns. Accordingly, the court rejects the argument.

As for plaintiffs' contention that defendants presented materially false and misleading information when USFWS (and later plaintiffs) asked whether the socioeconomic data used to develop the No-Build scenario already contemplated construction of the Monroe Connector/Bypass, the court also rejects the argument. In doing so, the court recognizes that disclosing materially accurate information is vital to the NEPA process. See Hughes River I, 81 F.3d at 447–48. Without it, agencies cannot promote public participation in the administrative process. See Robertson, 490 U.S. at 349; Nat'l Audubon Soc'y, 422 F.3d at 184. Thus, including materially false or misleading information in the ROD or other NEPA documents violates NEPA. See, e.g., Sierra Club v. U.S. Army Corps of Eng'rs, 701 F.2d 1011, 1030 (2d Cir. 1983); accord 40 C.F.R. § 1502.24 (requiring agencies to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements").

27

Here, in responding to USFWS's and plaintiffs' comments, defendants mistakenly stated that the data did not contemplate construction of the Monroe Connector/Bypass. (AR 029557, 029660). Such statements were contrary to what defendants knew, (AR 022199, 022931), and defendants later retracted them. See Fed. Defs.' Mem. Supp. Mot. Summ. J. 33–34; State Defs.' Mem. Supp. Mot. Summ. J. 12, 49–50. These misstatements, however, are not material. Each was accompanied with an assurance that using the socioeconomic data to project traffic volumes and to forecast the growth-inducing impact of the Build and No-Build scenarios was proper. (AR 029557, 029660). As chronicled above and as reflected at length in the Administrative Record, defendants supported this assurance with several ample investigations into the propriety of using the data.

The court has reviewed the record holistically and concludes that the misstatements were not materially false or misleading and did not violate NEPA. See Nat'l Audubon Soc'y, 422 F.3d at 186. In sum, the court rejects plaintiffs' arguments that defendants failed to address USFWS's concerns about using the socioeconomic data in the ICE analyses, and that defendants violated NEPA by misstating that the socioeconomic data did not contemplate construction of the Monroe Connector/Bypass.

IV.

Accordingly, the court DENIES plaintiffs' motion for summary judgment [D.E. 47], GRANTS federal defendants' motion for summary judgment [D.E. 50], and GRANTS state defendants' motion for summary judgment [D.E. 52]. The clerk shall close the case.

SO ORDERED. This **24** day of October 2011.

JAMES C. DEVER III
Chief United States District Judge